Good morning, Your Honor. Good morning. May it please the Court, initially, may I request to be able to reserve five minutes of my ten minutes for rebuttal if I find it necessary. I hope to confine my initial remarks to five minutes. Well, of course, this case may take a little more time than we have allotted. Go ahead. Okay. Thank you, Judge. Once again, I appear before this Court in a rather dismal saga of blatant government misconduct that began, as Your Honors know, over a year, over a decade ago. In what I think I could fairly describe as a scathing opinion rendered three years ago, in July of 15, this Court, in reversing the trial court's denial of defendant's motion to reconsider, did not simply remand for a hearing on defendant's motion, but ordered the indictment of David Mark dismissed, thus forever, forever materially altering the legal relationship between he and the government, and clearly, by definition. That was true in Chapman also, wasn't it? In Chapman, the indictment was dismissed with prejudice. So how do you distinguish this case from Chapman? I'm distinguishing it because in this case, when Your Honors dismissed that indictment, you were dealing with the substantive guilt of David. And at that time, how do you? Well, in what sense was that? Because I don't recall anything in the opinion saying that he didn't participate in this mortgage scheme. I don't think that's what the opinion was about. No, that he's not. Well, in fact, he knew. I'm sorry, Judge. In fact, your client knew a lot about the mortgage scheme. Of course he did. So there's no question that he wasn't innocent. He was a participant, but in a case in which he never, ever should have been indicted. The indictment added its harm. That's two different things. There's two different things there. It shouldn't have been indicted because the government didn't meet its burden in showing the terms of the contract and looking at the agreement they had as a contract, they could never show that he, or at least to the prior court's satisfaction, that he somehow went back on the agreement. That's very different from that he was innocent or that he was not guilty of anything. I understand what Your Honor is saying. My point is you never get to the point of his being guilty or involved or aiding and abetting in the scheme. They granted knowingly immunity. Therefore, everything that flowed thereafter, that indictment What's your best case for that? I can't spell it. The best case I have are the cases that say where there's a material alteration in the actual relationship between the two parties, the government and the defendant, that in that instance we are deemed a prevailing party. But that same case I think says it has to be a decision on the merits. I'm sorry, Your Honor. I think the same case that you're citing that language from states that it also has to be a decision on the merits. I understand. If we are reaching beyond that, I suggest there is no way you can define us as not being the prevailing party when you read Judge Freeland's decision on behalf of a unanimous court. If we're not the prevailing party, I don't understand how anyone could ever be a prevailing party. But there's a difference between saying you were right on the merits and saying that the contrary position was in bad faith, frivolous, the Hyde Amendment standard. Bad faith. So the earlier Ninth Circuit decision doesn't say anything about whether the government took its position in bad faith. It just means they were wrong. No. With all due respect, and we've come to it, that opinion made three facts perfectly clear. Facts accepted by that opinion found by this Court that Brian Pugh knowingly granted informal immunity to Mr. Mark back in March of 08, that such grant of immunity was never disclosed to me as defense counsel until forced to do so mid-trial. But third, and most important, Pugh's claim of Mark's breach of the immunity in a judge Friedland's words, quote, directly contradicted by the government's telephone records, which we unearthed post-trial. But that just means the government was not able to meet their burden of proof. There was no, was there? I don't recall there being any reference to bad faith. There was no reference. To there being ill will, to be no purpose. Absolutely. It was not before the Court. Okay. So that's, I mean, so here we have to determine, if you agree with me, whether he's prevailing party in light of our case law, and then also whether there was bad faith. I think there is that additional element. In simple terms, and if you recall, Judge Friedland, there was no reference to bad faith. Okay. It was not an issue. We're not. I'll stipulate to that. The issue here is bad faith. But if you look at the facts found by the Court, that the telephone call directly contradicted sworn testimony under oath. And if you look at the concurring opinion, which in more explicit terms said no call occurred. In brutal, brutal terms, excuse me, in simple but brutally honest terms, Brian lied under oath. That's bad faith. The district court did not find that. No. But you found facts from which the bad faith cannot, there's no. In fact, the district court, you know, credited the testimony. Bear in mind, when we were here the last time, you offered Mr. Levitt the chance to go back and do whatever they wanted. No. He rejected that suggestion. And it's why there was, when you remanded, you only remanded for, you remanded for dismissal of the indictment. Sorry. Go ahead. The government chose to stand on the record. I wanted to ask you about a comment that you made in the colloquy in the break after Ms. Brown testified. So this is when you find out that she's been immunized. Excuse me, Judge. We didn't find out she was immunized until after I object. In other words, what, I'm sorry, I interrupted you. Go ahead. There's a colloquy after you found out she's been testifying, you find out, and then you say that there was a conversation. You thought it was in February 2011, but you thought, you knew, you said you knew there had been a conversation, quote, in which, for whatever reason, Mr. Pugh was unhappy with what Mr. Marks was telling him, end quote. So you knew before this came up during the trial that there was some question about whether Mr. Marks was doing what he was required to do. At September 13th meeting, the first time I ever see Mr. Pugh, that's what I'm referring to. I remember it as clear as day. His antagonism towards Mark was clear, and he said there that he was uncooperative. Where that came from I don't know any more than I don't understand why he didn't tell anybody about the immunity. You had some plea discussions, did you not? Absolutely. In fact, I came down here in December with the idea of pleading, and on the last moment on the eve of that arraignment, the decision was made by my client to go to trial. So you've got an intelligent client who has been given immunity. You come to a plea discussion, and you don't find out that he's not been cooperative and that this interferes with his ability to get immunity? I don't find he's been immunized. I'm never told he's been immunized. Not only am I not told he's not immunized, they don't tell me he breached it. There's no mention of this fictitious July call. There's nothing. I hear that I knew what they did. You knew. Let me tell you what I knew. You go ahead. What I knew is they had been in the presence of David and Kim in March when they first meet Pew, he says, basically, Mark says to him, what's going on about us, tell the truth and you don't have to worry. That's basically what I knew. Nothing more. There was no suggestion that there was a full-blown immunity. Well, when you say full-blown immunity, he was not given full-blown immunity. He was given full-blown immunity from prosecution. No. Well, he was given limited immunity, which I think there's a lot of confusion in this record about exactly what kind of immunity he was given. There's full-blown immunity, which the Department of Justice rarely gives, which is like nationwide immunity. They have to go through a specific protocol. That's what's normally referred to as full-blown immunity. He was not given that. He was given some form of limited immunity, which I have some questions for your opposing counsel regarding that. But nonetheless, it was stipulated, I think, at the last hearing that was here in this Court, that he was given some form of limited immunity that said, if you cooperate, we're not going to proceed, you know, with filing charges, or it's going to take into account your cooperation. I think it was we're not going to proceed with filing charges, which was a limited type of immunity if you cooperate, correct? I would take issue with it, with all due respect. There was nothing limited. They couldn't prosecute him. He was given verbal immunity, which this Court and circuits throughout the country have recognized as being a legitimate form of an immunity grant. No. But I think you might be misunderstanding the question. The question is he was told he wouldn't be prosecuted for this mortgage fraud. I mean, if he goes and robs a bank, they didn't say they weren't going to prosecute him for that. Of course not. So it's not full immunity. It's limited immunity. In that sense, I would accept the phrase limited. He could not be prosecuted for anything done under the Mazzarella Real Estate Company.  Does he cooperate? He had to cooperate. Absolutely. He absolutely did. Look at the February 302. But the question is it was contingent on his cooperation. Was it what? Contingent upon his cooperation. Yes. Okay. And so we have the situation that arose, and that is, according to Mr. Pugh, he failed to continue to cooperate. In July. Of 2011? Yes. Okay. And that's the whole phone call? Except the phone call. Of course. Yes, yes. But you knew, apparently, that there had been some discussions with the U.S. Attorney's Office, Mr. Pugh, that he had apparently tried to cooperate. The record seems to support that. And you say, as Judge Hinkle was asking you, at some point, I believe it's at ER444, during the extended colloquy that occurred on March 15, 2016, you stated that just before the search of, apparently it was Mark's employer in March of 2008, there was a time a promise was made to both Mark and Kim about not being subjected to prosecution. You said that on the record. I don't deny that I said it. Okay. And then you also stated during a colloquy that was a conversation in which Pugh was unhappy with what Mr. Mark was telling him. So how did you come to learn of that information? The only, it's what I said before, I knew there had been a question by Mark and or Kim, where do we stand? And they were told, cooperate, no problem. Okay, that's it. I've been a prosecutor and a defense attorney a long time. I know what immunity is. That did not constitute in my mind that there was an immunity grant. Well, you also had Mr. Mark's father was representing him. And apparently he knew, the father, that there had been discussions of cooperation. FBI. Correct. Let me finish my question. Okay. That there had been discussions with the FBI. And, in fact, I think it was on March 7, 2013, Miles Mark made a statement to an FBI agent while at the FBI's office that the FBI charged his son, despite the FBI's telling his son that they would grant him immunity if his son continued to provide the FBI with information. So apparently Mr. Mark came to know of this information prior to trial. So how was it unreasonable for Mr. Pugh not to assume, whether he told him, and he should have, it's one thing, but at this point we're looking at bad faith, how was it unreasonable for Mr. Pugh not to assume that Mr. Mark, the father, knew, would have told his lawyers, and there were indications that his lawyers would have known? Let's adopt that view of it. Okay. The whole case depends upon whether or not there was a breach. And the breach is based on a lie. So I'd like to ask you about this. So how do we know it was a lie instead of a mistake? So we know it wasn't true, right? But how do we know that it was an intentional lie about the phone call? They specifically, I didn't, it wasn't like it came out on cross. But Mr. Pugh sat on the stand during the trial, the hearing at the trial on the issue, and said, I have this clear recollection. We were sitting in the conference room, and I remember reaching for the phone and calling Mark, David Mark, on the phone number we had, where we had reached him back in February. Right. We know, you don't have to repeat the entire thing. We know it wasn't true. But how do we know that he wasn't confused because he was thinking about a different case with a different mortgage fraud and a different person, and he was wrong, but not intentionally wrong? How do we know that? You don't know it, but it's clearly a legitimate inference that he knew it never occurred. According to your ruling, David denied that call, contrary to what the government and Judge George is saying. There never was a failure, it wasn't a failure in memory, as Your Honor put in the decision. David denied any such phone call ever occurred in July. If you take those facts, and you take all of the big, all of what the government calls disheartening blunders that Mr. Pugh made, all the failures of disclosure, and you put that against what is, if someone says to me, X occurred on such a day, I made a phone call. So are you resting your case on the idea that we need to find that the district court, or believe the district court was wrong to think that Pugh was just mistaken about the call, or are you resting your argument on something like all the failures of documentation themselves were bad faith? Oh, that in conjunction with what I suggested is a monstrous lie about the call. I'm not sure how we can do that when the district court looked at the witnesses and didn't believe your client and believe Pugh, that Pugh was mistaken. I don't believe that, I think it's up to Your Honor to make an ultimate call. We're not in the best position to do that at this point in time. After the district court had a hearing, was able to hear everybody's testimony, how are we in the best position to make that determination? Because I think Judge George, following the government's argument on that hearing, misdescribed it all candor. What he said, without any factual support, is that, oh, they made a mistake about some specifics about that call. There was no testimony that they made a mistake about specifics. They supplied, Pugh supplied the specifics, and they tried to pull away to suggest, oh, maybe really a call occurred, but it happened at some other time to some other form. There's nothing in the record to support that. The lie, flaunt, hysteria is in the face. I don't understand how you say there's nothing in the record to support it. When Mr. Pugh got on the witness stand under oath and said, I made the call, and we've got a district judge who credited the testimony that he made the call, and you're telling us it's clearly erroneous for the district court to have believed the eyewitness testimony of the person who says he made the call. Yes, Your Honor. I'm not saying it's erroneous. I'm saying it's erroneous in light of what directly contradicted. According to this Court, who had a record before it, same record. No, it wasn't. Yes, it was, Judge. The hearing, so Your Honor understands, Judge, Mr. Pugh took to stand twice. There's the hearing held in mid-trial when he admits to making the call, and that's the one time he describes how it was made. Did he testify after the Ninth Circuit ruling? Yes. And he forejudged, but there was nothing different. He didn't undercut his own testimony. He never did. If someone could show me where he did, I'd be happy to look at it. What motive would he have? I've been asking my, look, I have no idea what motive it is. I've seen prosecutors, unfortunately, do inappropriate things, never understanding their motive. Grossly negligent and perhaps grossly negligent. No. Arrogant and believing that he could do no wrong. I sat in a meeting on September 13th and watched him go. We went to the meeting looking to have him rehearse. So what's your strongest case in support that there was bad faith? The lie. The lie at the core of this. Give me a case. If there had been a breach, we had a right to know about it. Mr. Fowler, do you have a case? A specific case? Yes. No, I do not. Okay. All right. And so my last question for you, and I don't know if the other judges have a question, what's the burden of proof required for a party to prevail on a Hyde Amendment motion? I think, well, the burden, our burden is by preponderance, and I guess the burden on your, I say the burden, the standard from your honest point of view, is there an abuse of discretion similar to the abuse that you found with respect to Judge Probe? I mean, I don't think there's any question the preponderance of the burden was on us. I think we met it. And I think it's supported by this Court's opinion on the same record, Judge Engler. Thank you. I'll give you some time for rebuttal. Thank you so much. Thank you, Mr. Fowler. May it please the Court. Peter Levitt for the United States. The district court, after a full evidentiary hearing on the Hyde Amendment issued, acted well within its discretion in finding that the defendant failed to carry his evidentiary burden of proving that the government acted with bad faith. This burden, the Hyde Amendment burden, is, as our colleagues in the Eleventh Circuit have pointed out, a daunting burden, and defendant fell well short of it. To show bad faith, defendant bears the burden of showing that the government, according to this Court's Manchester Farming opinion, affirmatively operated with furtive design or ill will, and defendant simply didn't prove it. Well, let's talk about the Hyde Amendment motion hearing, I guess, that occurred subsequent to our previous ruling. It appears Mr. Pugh testified that it was not until Mr. Fowler, as this quote, yelled it during trial, and I guess that would have been on March 15, 2013, when Mr. Fowler objected to Mr. Pugh's question of Ms. Brown on direct examination, that Mr. Pugh realized he had given Mark immunity. However, Mr. Pugh later testified during the same hearing that it was during the July 2011 call that Mr. Pugh unilaterally determined that Mark had breached his immunity agreement. So my question is, seems like inconsistent statements there, and when did Mr. Pugh actually determine he had given Mr. Mark immunity? I believe the answer to that is March 2008. I believe Mr. Pugh, while he has subsequently made many mistakes and said contradictory things, Mr. Pugh, at the end of the Kim Brown-David Mark debriefing at the U.S. Attorney's Office in March 2008, David Mark at the end of that said, what's going to happen to me? And Mr. Pugh said, with no documentation, with no authority, with no permission, said to David Mark, just keep cooperating and you'll have nothing to worry about. So is your position that he then forgot that he had done that? I don't know how to reconcile the two statements that Judge Murgia asked about. I don't know how or why Mr. Pugh made the subsequent statement that Your Honor has pointed out, which highlights a valid inconsistency. So we have that inconsistency. We have him testifying about a phone call that definitely didn't occur, at least the way he says it did. Yes. We have many things that should have been documented that weren't. Correct.  of documentation. How do those things not add up to a pattern of such disregard for Mr. Mark's rights that they're bad faith, even if not a single, any one of them itself is bad faith alone? I would respectfully submit that viewed in the aggregate, Your Honor, they represent negligence. Aren't they at least recklessness? I mean, it's outrageous. I mean, how can you have outrageous thing after outrageous thing after outrageous thing and add it up to just well, oh, well? I would submit, Your Honor, that the district court was presented with that very issue. The district court was presented at the Hyde hearing with precisely what Your Honor was talking about. Mistake number one, he gives David and Mark immunity. Mistake number two, he doesn't even write it down. Mistake number three, after the July 2011 phone call, when David Mark says he can't remember anything, he writes nothing down, not even an internal. But so we know the district court heard these same things. Right. I mean, so does that mean the district court made a legal error? Because once you add all those things up as a matter of law, that's bad faith? I mean, I'm not sure where you're heading with what the district – what's the single thing we have to defer to that the district court did? Maybe the district court thought about this wrong. I don't believe the court did, Your Honor. I think the court looked at all of these things and saw mistake after mistake after mistake after mistake and said, this is bad, and I'm going to and did admonish the former prosecutor in a written opinion, but this does not surmount the high hurdle imposed before Hyde Act recovery. What kind of immunity was he given? I'm just curious because I'm not quite sure people even know. I share Your Honor's confusion. The only parameter, contractual parameters of this agreement is one guy, the offeror, saying, what's going to happen to me? And the offeree saying, just keep cooperating and nothing is going to happen to you. It's clearly transactional immunity, not just use immunity. It's transactional immunity. I would agree with that. Okay. I guess, the district court judge below used this standard and I guess to follow up on what Judge Freeland asked in sort of saying, Mr. Mark had to show that no reasonable prosecutor would have thought that he didn't know about the immunity or that his lawyers would not have had reason to know because Mr. Mark knew about the immunity. I think that I'm paraphrasing, but so it's a different sort of way and should we just accept that standard and if so, why? No, Your Honor. I think it's important when this Court reviews the district court's opinion to look at the totality of the ruling. I think what Your Honor is getting at is the second part of the district court's ruling on bad faith. We haven't even gotten to prevailing party. That's the second part of bad faith. The first part is the district court went through the record and said where do we have somebody operating, affirmatively operating with furtive design or ill will? And the district court found nothing. The district court found a medley of negligent errors, but didn't find affirmative operation with furtive design or ill will. Now, the second point was the theory that the prosecutor did not tell David Mark's attorneys, hey, your client has some sort of immunity. He didn't. But he didn't also tell them that Ms. Brown had some sort of immunity. I mean, I understood the argument in your brief that he assumes that Mark's attorneys know about that immunity, but surely he can't assume that they know that another witness has been immunized. I believe that's a fair characterization, Your Honor. But what we do know is that, first, David Mark knew that he and Kim Brown had immunity. Miles Mark, who is part of David Mark's father, who is part of David Mark's trial team, knew at least one week before that his son had been given some sort of immunity. It doesn't matter what kind of immunity. David Mark's father and lawyer was aware that his son was immunized from prosecution, or at least there had been some sort of promise to that. But isn't the real issue the breach? I mean, so let's assume everyone knew he was immunized. There's still possible bad faith as to whether he really breached or whether somehow Pew just decided, I wish I had never done this. I'm going to prosecute him anyway. And I'm back to what you think the district court did on this, on this question of whether there was really bad faith as to whether there was a breach. I'd like to look at what the district court said on page 19 of the district court opinion, which is excerpts of Record 22. It seems like the district court says Pew was aware he granted immunity. And then the next paragraph is, Mark has not shown that he did not engage in any conduct that Pew could reasonably construe as a breach of the immunity agreement. I think this is what Judge Merguia was asking about, too. The district court is asking Mark to prove a negative, to prove that there's nothing he did that Pew could have construed as something. And I don't understand how that — it seems like that's a very key move in the district court's reasoning. And I'm not sure — can you explain to us why that's a move that makes sense? I think it's a move mandated by the Hyde Amendment precedent, just as when we were here the last time, the government had to prove that this call occurred. And we couldn't, and we failed. Well, so it might be Mark's burden — it might be Mark's burden to — we know it is Mark's burden to prove bad faith. But why is the way that you have to do that to show that he did not engage in any conduct that Pew could reasonably construe as something? Isn't it Pew's obligation when someone breaches to tell them they've breached? Because it's in Pew's head whether they breached. So how can Mark ever prove what's in Pew's head? Your Honor, I think when Mark received the target letter in August of 2011, Mark knew or should have known that, hey, despite my being promised immunity back in March 2008 — But the target letter didn't say anything about breaching or not cooperating. That's correct, Your Honor. That's mistake number five. I think this goes to a legal question that I did want to get your input on, and that's at what level do we look at bad faith, vexatious and so forth. And the question is, does the government's position overall in the case have to be in bad faith, or is it enough that on some subsidiary issue, failure to disclose or whatever, the government has taken a position that is in bad faith? I'm not sure I understand Your Honor's question, but as I read this Court's precedent, and I'm primarily thinking of Chapman and Campbell or Chapman, the government — the action that — the government action or inaction that causes the dispute, we'll just call it, has to have been undertaken with ill will and furtive design. So, and I think that's where the district court may have been going to say that, look, if there was a basis for the government to assert that Marks had breached, then he doesn't have immunity and it's okay to prosecute him. We know from the earlier decision that it turns out that was wrong, that he — the government didn't establish breach, so it was not okay to prosecute him. But we don't know from the earlier decision whether that was in bad faith. Correct. In the government's opposition to Mr. Marks' motion for attorney's fees, three years, I guess, after Mr. Mark alleged breach became an issue at his trial, the government tried to admit into evidence, and I think it was August 2011 memo, in which a USAPU stated, it's a memo to his supervisor and to the U.S. attorney, that in our last interview of Mark, Mark pretended to have forgotten everything. Why? Why? Or how was it that memo was not located or produced earlier? I don't know, Your Honor. I know that in the wake of this Court's first opinion, I asked that everyone search every email for any possible communication in this period — time period. But I don't know if — I don't know why that was not propounded at the March 2013 hearing. It's a really rather stunning lack of disclosure when there was a lot at stake. I'm just trying to figure out, you know, these mistakes seem to go beyond Mr. Pugh and going on in the office there, and that's of concern as well. It also seems like we gave the opportunity to remand, last time we were here, for exactly this sort of email to come out, and you told us nothing is going to come out. So it seems like for you to have made that representation, there should have been a question, does anyone have an email, before you argued to us last time. I don't understand what happened here. I made my representation based on what I knew at the time. And that's all I can say in that regard. So do you have a case that can guide us on whether, when it seems like an office has gone rogue, say? I mean, is there any level of crazy level of mistakes that could amount to bad faith? Or is your position just complete sloppiness, you can do whatever you want, as long as you're just sloppy and not on purpose, that's just never enough? I mean, that seems like it's your position? And if so, what is a case that tells us that? Well, Your Honor, I believe this Court presided over a case involving former Senator Stevens and a discovery concealment there that did indeed reflect ill will, affirmative ill will. And I don't believe we have anything like that here. But how do we know that's necessary? How do we know that that's sufficient? We know that's sufficient, but how do we know that that's necessary? Maybe this level of disregard for the defendant's rights, when a prosecutor's office is functioning, at some point is not acceptable. Do we have a case that doesn't, that tells us that's not the case? I mean, it feels like, is it true that we're in an uncharted territory here? Yes, Your Honor. I think we're in a territory that's not only uncharted, but I would respectfully submit a territory that would lessen the Hyde Act's, Hyde Amendment's stringent evidentiary standard for the recovery of fees in situations like this. We didn't, I don't think, hear your position on prevailing party. Can you please tell me your position and why? Yes, Your Honor. I believe in the wake of Campbell and Chapman that while Mark has received an adjustment in his legal position, he's not prevailed on the merits. And he's not prevailed on the merits because this Court requires, as Judge Wardloss wrote in Chapman, it requires some evidence relevant to guilt or innocence. And we have nothing of the sort here. But the Hyde Amendment is about whether someone should have ever needed to incur attorneys' fees, right? And Chapman itself was about a case where the person was legitimately prosecuted. It's just the prosecutor's office did things that were wrong. Here, if Mr. Mark is right, he should never have been prosecuted at all, right? So he should not have needed to incur fees at all. So isn't that a real difference from Chapman in terms of the purposes of the Hyde Amendment? No, Your Honor. I don't think so. I think this all turns on the July 2011 call. If this did not occur and the prosecutor simply made this up to vindictively prosecute David Mark and there had been any evidence along those lines, then I believe we'd have the problem Your Honor has articulated. But we don't have anything like that. And David Mark did not testify at the Hyde Amendment hearing. He testified at the March 2013 hearing, but he stayed off the stand at the Hyde Amendment hearing. And why was that? I would have to defer to opposing counsel. But this is they called Pugh, Kim Brown, and Miles Mark, and they let it ride on that. And the district court, after considering evidence, all the evidence viewed against the backdrop of this case and the procedural history, said he's not a prevailing party and alternatively hasn't established bad faith. In the case that you cite regarding, you know, has to bear on his guilt or innocence as a determining factor here, whether he's a prevailing party, there's also language about a material alteration of the relationship or the parties. Can you please address that? Yes. There was a material alteration of the relationship of the parties when this court tossed the indictment out and tossed the convictions out and dismissed the case. Certainly. But as I'm reading the precedent, I'm seeing that this court is saying there's something more. If material alteration is all we have, then every time a case gets reversed, we're going to have Hyde Amendment fees. I see Judge Wardlaw's, I'm not going to call it gloss, but I'll say insight, into material alterations. There's got to be something that bears on guilt or innocence. And here we have a defendant who is convicted of four felony frauds beyond a reasonable doubt. There's no evidence by Judge Proe, who's now retired, but presided over the initial case. He never said even a hint of, ah, the evidence is pretty weak here. But the implication of what we said before is that he should never have been indicted. And that's a real – I'm still not sure why that's not a very significant difference from Chapman. It's true that Chapman didn't think of this situation, because the situation in Chapman wasn't like this. But here we have someone who was not supposed to be prosecuted at all. And isn't that almost equivalent to innocence for all – it's like a constructive innocence or something? I mean, it's – why is that not equivalent? No, Your Honor, because it's not equivalent because we gave him the immunity because we wanted him to – he was certain litany culpable. He's Eve Mazzarella's right-hand man. We wanted to call him against Eve Mazzarella. We thought he was going to be our best witness against her. He had all the dirt on her. He'd seen everything during this fraud. So we know he's guilty. We know he's guilty. But once he has immunity, unless you can show that it's breached, isn't it like constructive innocence? I mean, I just don't understand how the implication of our last opinion wasn't that he needs to be treated as innocent. Because I construe, and I realize I'm talking to the author of that last opinion, I construe saying to a clearly culpable defendant, you just keep cooperating and we'll go easy on you, as saying not that you're constructively innocent, but that you're constructively guilty. But you can't be prosecuted unless breach is proven. That, of course, is true. And that has – brings us right back to the July 2011 dilemma, which we can't prove it happened, this call happened. I was trying to look at what Pew said at the Hyde Amendment hearing about that call. So can you point me to anywhere where he says, I'm really sorry, I must have the details wrong, but I think some call happened. I mean, does he ever acknowledge that his testimony before was wrong? I cannot recall, but I believe there was something, I can't find it right now, in the record. I might have been looking at the wrong page. I was just looking to try to remind myself of this. He definitely testifies there was a call. He does that again. Yes. I am not – maybe it's just somewhere I didn't see just now. But I don't see him ever kind of own the fact that something must have been wrong about his recollection. Can you point me to anything like that, where he basically tells the Court, yeah, I was wrong, but it's really just a mistake, where he tries to explain how this happened? I can't find it in my notes right now, Your Honor, but I believe that was the case at the Hyde hearing. It was abundantly clear to Pugh at the Hyde hearing that he did not, as he testified in March 2013, call David Mark from a speakerphone in the conference room in the same manner as he did in February 2011. Pugh was aware that that was wrong. I believe there was a recognition of that obvious fact. But if there wasn't, the district court certainly picked up on it. Did he ever explain, Mr. Pugh, why he did not document the alleged breach? No, he did not, Your Honor. Did somebody ask him that directly? Somebody in our office? Anybody. And did Mr. Fowler, did you, did at any point in time anybody ask him? I don't know if anybody asked him directly why he didn't do it. Why would that not have been a basic question to have inquired about? I think the fact that he negligently failed to write anything down at any point about any of these material issues spoke for themselves. Better than him speaking for it? I think that's an academic debate. I don't think I have anything else. I don't think any of the other judges have anything else. Thank you very much. Thank you, Your Honor. We've taken you way beyond your time. Thank you. May I have a judgment? Yes, of course. I listened intently to the examination or the dialogue that just went on. Two points I think are clear. One, I would adopt Judge Friedland's view, which I didn't have the insight, that obviously this is not Chapman. This is about what the Hyde Amendment is all about, as Judge Friedland said. It's about somebody incurring not only a nightmarish three years, but legal fees and expenses, extraordinary ones, when he should never have had to spend one penny. Well, he should never have had to spend one penny, only if there was no good faith basis for the government to assert that he breached. I agree. And that brings us to this. So it really comes down to that. It all comes down. I'm sorry. Go ahead. I'm sorry, Judge. I agree with you. You're interrupting, though. I apologize. Please. I didn't mean to. Go ahead. It all comes down, as counsel for the government has said, as Judge Friedland has said, to the July call. If there was no breach, if there was no breach, then they had no right to prosecute. We know, we absolutely know, that there was some communication where the prosecutor was not happy with what Mr. Mark was saying. Only in September of 11, when I met with him. That was the unhappiness that I alluded to. I thought you were talking about February. February is total cooperation. There's total, excuse me, there's a 302 reflecting, and the testimony is categorical in February. The phone call made to the same number that allegedly was made in July was a totally cooperative phone conversation. So testified to by Mr. Pugh and by, I think, Agent Jones as well. There's never been an end by Mr. Mark when he testified. So what were you talking about when you said you know there was a conversation when Pugh wasn't happy? With the conversation in my presence. In September 13. Conversation when? Pugh. And Mark. Mark and the other. Stop. Wait. Judge Hinkle, stop. Judge Hinkle, proceed with your question. Go ahead. You said on the record that you thought the conversation was in February, and unless I'm misremembering it, you said as part of the colloquy that it was a long time before you ever heard of the case. Then I was mistaken as to date. I'm not in the case in February. Exactly. You said in the colloquy that before you ever heard of the case, you knew that there was a conversation where Mr. Pugh was not happy with what Mr. Mark was saying. I can't answer that question. The only time that I was aware of Pugh being unhappy with Mark was September of 13. Excuse me, September 13 of 211, the first time they meet him. That's, again, I can't answer it any other way. Mr. Fowler, when did you come in to represent? The day after, within a week of getting the target letter. And was he represented before then? No, except what happens is they get a target letter. Miles Mark is a friend of mine. He calls me up. He tells me about it. He's already spoken to Pugh, just acknowledged that he got the target letter. I then take over all communication, and I immediately arrange to try to have a meeting, because as far as I know, David Mark was supposed to have been a witness. That's against Mazarella, and Mazarella's trial had not yet taken place. It was going to take place. So you knew that Mark was going to be a witness? Absolutely. So how did you not know that he had a cooperation agreement? Why would he have been a witness? I'm sorry, Judge. How can you both say that you knew he was going to be a witness and also say that you did not know that he was cooperating with the government? I didn't know the — what I'm saying to you is I knew Pugh was totally unhappy with Mark on September 13th. No, I'm asking a different question now. How is it possible that you would know that he was supposed to be a witness and not ask him, well, why would you do that? Aren't you going to be testifying about things that you did that were illegal? And wouldn't he have to say then, well, I got an immunity agreement? I don't understand how you can stand there and tell us that you didn't know he had an immunity agreement, but you knew he was going to be a witness. We're all talking about it as if he was phrasing it in terms of immunity. Their worried immunity is, of course, something I understand. But David had a guarantee, a promise, how enforceable that all he was told, cooperate and don't worry. And that was the basis of the February phone call. It was at that time the Mazzarella trial was going to take place in May of that year, May of 11. In February, he's totally cooperative. There's no issue about that as far as I understand it. When I come into the case, I understand there's a target letter. There's nothing about a breach, nothing about immunity. So I, not understanding what's going on, I want to meet with the prosecutor. And we arrange a meeting for September 13th. I come to the office, and it's the most acrimonious conversation. I mean, I'm just, all I can do is tell you that what it was was Pugh getting ready to try the Mazzarella case, having Kim as a witness, and I don't know who else. But I know that he was angry at David. And I tried to get him to rethink that. I asked him to call me the next day I was at the hotel. He did not back off his position that he was going to go forward with the prosecution. So why isn't the fact that he was angry itself evidence that there was some sort of breach here? It may have been, but it's not. I had no reason to believe that. If he had said to me, if he had said to me, look, your client fell off the truck or decided not to cooperate when I called him in July, we would have dealt with it. But he never said that. There was no mention of it. Wait, can you stop? Because Judge Hinkle is trying to ask you a question. I'm sorry. But doesn't this whole chronology just fit with the theory that there was a breach? You've got a situation where you have a witness, they say, if you just cooperate, you'll be a witness, we won't prosecute you. Then there's, just give me a minute, then there's a conversation, by the time you see him in September, he's upset. Well, that's consistent with a cooperator who has said, I don't remember anything. And, of course, at that point, you say you would have dealt with it, but there's no way to deal with it, because you've got a prosecutor who has interviewed somebody who knows the facts, and then they've interviewed him again, and he says, I remember nothing. And now, if they try to put him on the witness stand, if they're being honest about it, they're going to have to tell the other side, and, by the way, I had a conversation with him where he said he remembers nothing. At that point, he's a pretty useless witness. But if he had, when I went to him in September with David, it was to try to persuade him to use David as a witness. Did you listen to my question? The reason he can't use him as a witness at that point is because he's had a conversation with him in which he says he remembers nothing. I know nothing about that. Don't I have some, don't they have some obligation to tell me that? Yes, but we were talking about Judge Friedland's line of questions that you agreed with when you first stood back up, which is the case gets down to the point where, whether he should have been prosecuted at all. And if the government has a good faith basis to say he has breached, he has no immunity, we can prosecute him, it matters what the government knew, not what you knew. And it seems to me that what you've told us is a series of events that fit. And whether the phone call took place in July from the conference room or some other time, everything seems to fall into place, that he first cooperated and was going to be immune. Then he had a conversation where he remembered nothing. They sent him a target letter. When you met with him in September, he was upset. They indicted him and prosecuted him, and here we are. Under the law, as I understand it, if there is immunity, as there was immunity, and if there's an alleged breach, we have a right to remedy that in a hearing. That's what the law says. And you were not given that opportunity. Never. And the result were the charges against your client were completely done away with. That is an enormous benefit. Now, this is a separate hearing. You're seeking attorney's fees under the Hyde Amendment. So you have gotten an enormous benefit for your client to get this relief that you're asking for. There's critical elements that have to be met. You talked about how, you know, that was wrong. There's no dispute that the government, we've already ruled on that, didn't meet its burden in that prior hearing. Today, the critical points that you have to make is that your client was a prevailing party. We have discussed that. The second is the bad faith, the ill will. And that's what this discussion is about. I want to make sure you understand that before you walk away from the podium. I don't have any other questions. Do you have any other questions? Do you have any other questions? Thank you, sir. Thank you. I want to thank both counsel for their presentations. I know we took you both longer than the time that was allotted. There's a lot of important questions that need to be asked and issues that need to be addressed. I appreciate both of the presentations very much, so thank you. The matter of the United States of America v. David Mark is now submitted.
judges: Murguia, Friedland, Hinkle